# IN THE SUPREME COURT OF MISSISSIPPI

# NO. 2003-DP-00765-SCT

*DEVIN A. BENNETT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF TRIAL COURT JUDGMENT: | 02/28/2003 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN, III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL DEFENSE COUNSEL |
| | BY: ANDRE De GRUY |
| | STACY P. FERRARO |
| | J. EDWARD RAINER |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MELANIE KATHRYN DOTSON |
| | MARVIN L. WHITE |
| DISTRICT ATTORNEY: | DAVID CLARK |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 05/11/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1. This is the appeal of a capital murder conviction and death sentence handed down by a Rankin County Circuit Court jury.

## BACKGROUND FACTS AND PROCEEDINGS

¶2.     Brandon Allen Bennett ("Brandon") was born in June 2000 to Yolanda Lewis ("Lewis") and the Appellant, Devin Bennett ("Bennett").  Two months later on August 25, 2000, at 8:45 a.m., Bennett took Brandon to River Oaks Hospital where nurse Collette Moreland ("Moreland") took Brandon from Bennett, noting that the baby was pale, cold, and not breathing.  The medical records indicate Brandon was asystolic, meaning he had no heartbeat or pulse.

¶3.     Moreland took Brandon to the emergency room where she began mouth to mouth resuscitation and chest compressions.  Brandon was intubated, and an IV was started.  Two more nurses, an emergency room doctor, a neonatologist, and a respiratory therapist were called in to assist with Brandon's condition.  After approximately twenty-five minutes, Brandon's heartbeat returned.

¶4.     Bennett initially did not follow Moreland when she took Brandon into the emergency room.  Later, when asked by the medical staff what happened to Brandon, Bennett said he awoke around four o'clock that morning to find that Brandon "appeared to have slipped out of his car seat onto the floor."  This was Bennett's first of at least seven different versions of the events leading to Brandon's death.  When questioned by two social workers at River Oaks, Bennett offered two accounts of the story.  He told Jerri Strickland ("Strickland") that he noticed the baby breathing funny sometime around four o'clock in the morning and he gave him a bottle and placed him in a car seat.  He then told Strickland that he awoke later to find

2

Brandon on the floor. However, when he spoke with social worker Leslie Jacobs ("Jacobs"), he told her that sometime around eight o'clock that morning he found the infant on the bedroom floor. Bennett specifically stated to Jacobs that the car seat in which he placed Brandon was located on the floor – not on the bed. He also told Jacobs that because Brandon was very strong, he must have moved around in his seat and toppled onto the floor. Both Strickland and Jacobs noted that Bennett was acting in an odd fashion.

¶5.     Ultimately, after Brandon's heartbeat returned, the medical staff decided to transfer him to the pediatric unit at the University of Mississippi Medical Center in Jackson ("UMC"), which they felt was better equipped to handle an infant in Brandon's condition. Upon his arrival at UMC, Brandon was in a coma, unresponsive, and on life support. Rebecca Pruitt ("Pruitt"), a social worker in the neonatal intensive care unit at UMC, spoke with both Bennett and Lewis. Bennett told Pruitt that he had been visiting a neighbor on the night of August 24, and that upon arriving home at 12:30 a.m. on the morning of August 25, he put Brandon in his car seat which was on the floor. Bennett said he woke up at 3:00 a.m. to find Brandon had toppled out of the car seat and was crying and lying on the floor. He told Pruitt that he placed Brandon back in the seat and went back to sleep.

¶6.     At UMC, Brandon was placed under the care of Dr. Bonnie Woodall ("Dr. Woodall"), who the State would later call as an expert in pediatric emergency medicine. Dr. Woodall examined Brandon for head injuries and performed a complete neurological exam. She also looked over Brandon's body for evidence of trauma or infection, and she noticed that Brandon

3

had bruising to his scalp in the "left ecchymosis" or "left frontoparietal scalp," bruising on his right scapula area, and bruising on his right lumbar area. She also observed swelling and discoloration along Brandon's upper left forearm. Dr. Woodall found multiple retinal hemorrhages in Brandon's eyes where blood had leaked out into the tissue of Brandon's retinas. Dr. Woodall stated that retinal hemorrhages to the degree suffered by Brandon "are associated with extreme trauma, motor vehicle accidents or injuries that require a great deal of force."

¶7.    X-rays of Brandon's body displayed a fracture in the left parietal of his skull. A CT scan revealed that Brandon had a subdural hematoma, which is a collection of blood just outside the brain but within the covering of the brain. Additionally, the neurological assessment showed that Brandon was in a coma, meaning he had no response to pain and made no respiratory effort. The medical staff further noted there were no signs of brain function.

¶8.    When Dr. Woodall asked for Brandon's history to help her diagnose and treat him, Bennett stated that Brandon was sleeping in the car seat located on the floor, and that when he woke up and found Brandon on the floor, he put him back in the seat. In observing that the medical records included several versions provided by Bennett of when Brandon fell from the car seat, Dr. Woodall stated: "[i]n one notation, it was around 6:00 to 6:30. In another notation, it was 3:00 to 3:30 a.m. And another notation around 4:00 to 5:00 a.m." Brandon never awoke from the coma and was pronounced dead on August 27, 2003.

4

¶9. Master Sergeant Rodney Eriksen ("Sergeant Erikson") of the Madison Police Department went to the hospital to obtain statements from Brandon's parents. Brandon's mother told him that she and Bennett did not live together, and that Brandon had been alone with Bennett on the night he was injured. Sergeant Eriksen asked Bennett to accompany him and Sergeant John Chance to the police station to give a statement. Bennett provided Sergeant Eriksen several conflicting versions of the incident. When Sergeant Eriksen asked how Brandon could have flung himself out of his car seat onto the floor, Bennett changed his story and claimed the car seat fell to the floor. Later, he changed his story again to say that he accidently kicked the car seat off the bed onto the floor while he was sleeping. Eventually, Bennett admitted to Sergeant Eriksen that he shook Brandon, claiming it was an effort to elicit a response from his unresponsive child. Bennett stated, "[y]eah, I shook him . . . I shook him too hard." However, Bennett maintained he was not trying to hurt Brandon, but rather was just trying to wake him. Sergeant Eriksen also questioned Bennett as to why he took Brandon to River Oaks instead of the Richland Police Department, one of the two fire stations, or the Baptist Medical Clinic which were all within one mile of his home. Bennett responded that it did not take long to get to the hospital, just ten or twenty minutes.

¶10. On November 7, 2000, a Rankin County grand jury indicted Bennett for capital murder. He was charged with the underlying crime of felonious child abuse. At pre-trial hearings on February 5 and 14, 2003, the court heard several defense motions including three motions to suppress, one motion to dismiss, and one motion to quash. Also at the February 14 hearing,

5

the court considered and rejected Bennett's proffered guilty plea on the charge of heat of passion manslaughter. On February 18, 2003, jury selection began in the Rankin County Circuit Court, the Honorable William Chapman, III, presiding.

¶11. At trial, Dr. Woodall testified that Brandon had a subdural hematoma, diffuse swelling of the brain, a skull fracture, an intercranial hemorrhage, and extensive bilateral retinal hemorrhages. Dr. Woodall also stated that she could conclude to a reasonable degree of medical certainty that these injuries were not consistent with a child falling out of a car seat to the floor. She further testified that a skull fracture associated with intercranial injuries, such as the type suffered by Brandon, is an "indication that there was a more severe trauma involved." Additionally, Dr. Woodall stated that, in children, a hematoma is often the result of shaken baby syndrome, or the severe and violent shaking of an infant. When asked about the force necessary to cause a subdural hematoma, Dr. Woodall noted that the injury required "pretty significant force, and it would have to be a fall with some sort of angular rotational component to it, as flipping over or rotating in some fashion before they strike a surface." Furthermore, Dr. Woodall testified that it would be impossible for a ten-week-old infant, such as Brandon, to have sustained these injuries alone.

¶12. Dr. Woodall's expert analysis concluded that Brandon did not fall out of his carrier. She stated to a reasonable degree of medical certainty that if the infant carrier was raised fourteen inches and placed on top of a box spring, the injuries Brandon suffered would not be consistent with him falling out of a carrier from that position. According to Dr. Woodall,

6

Brandon's injuries, to a reasonable degree of medical certainty, were consistent with being shaken and thrown down on a hard surface.

¶13.   The State also consulted Dr. Andrew Parent ("Dr. Parent"), chairman of neurosurgery at UMC and an expert in the field of pediatric neurosurgery.  Dr. Parent noted that Brandon had a bruise over his frontal area, that his pupils were fixed and dilated, and that he had hemorrhages in both eyes.  Dr. Parent also noted that Brandon's CT scan showed the presence of a subdural hematoma, located under the dura (the tissue covering the brain) but on top of the brain, and a subarachnoid hematoma, located on top of the brain but beneath the subaracnoid membrane.  The CT scan also revealed blood collected under the tentorium, the piece of tissue that separated the upper part of Brandon's brain from the lower part.  According to Dr. Parent, the left parietal fracture and the hematoma were directly caused by blunt force trauma to the head.  When asked what could have caused Brandon's injuries, Dr. Parent stated that to a reasonable degree of certainty, Brandon's injuries were consistent with "someone taking the ten week old baby and just shaking them[sic] throwing them[sic] to the ground."  Dr. Parent testified that Brandon could not have lifted himself up out of the carrier, and these injuries could not have been caused by Brandon falling out of his carrier.

¶14.   After Brandon's death, an autopsy was performed by Dr. Steven Hayne ("Dr. Hayne"), who would later testify as the State's expert in forensic pathology.  Dr. Hayne testified that Brandon, who weighed only twelve pounds, had two skull fractures corresponding with a hemorrhage on the left side of his head and smaller hemorrhages on the right side of his head.

7

Dr. Hayne also linked the hematoma to blunt force trauma, noting that the significant injury to the left side of the head, combined with the separate injuries on the right side, were consistent with a direct blow to the head. Dr. Hayne testified that in addition to the subdural hematoma, there were areas of hemorrhage over the surface of the brain itself. Dr. Hayne discredited the defense's theory that Brandon caused these injuries to himself, noting "it would be highly unlikely that a two month old could even raise himself up and sit on the edge of his carrier." Dr. Hayne opined to a reasonable degree of medical certainty that these injuries did not occur from a fall from an infant carrier located on the floor. Dr. Hayne also stated to a reasonable degree of medical certainty that Brandon's injuries were not consistent with Brandon falling from the carrier located on the bed. According to Dr. Hayne, even if the carrier fell over from the bed, it would not produce a subdural hematoma or cause the severe diffuse brain injury Brandon suffered. Dr. Hayne concluded that Brandon was the victim of shaken baby syndrome followed by some blunt force trauma impact.

¶15. We pause here to review the different versions of the event Bennett told to the medical staff and police. Bennett told Moreland that he awoke at 4:00 a.m. to find Brandon had slipped out of his car seat. He told Strickland that Brandon had been breathing funny at 4:00 a.m., but he did not fall out of his car seat until 8:00 a.m. at which point Brandon stopped breathing altogether. He told Jacobs that at 8:00 a.m. Brandon fell out of his car seat, which was located on the floor, but that Brandon simply started breathing funny at this point but did not stop breathing altogether. Bennett told Pruitt that Brandon fell out of his car seat, which

8

was located on the floor, at 3:00 a.m. Bennett told Dr. Woodall that Brandon had been sleeping in his car seat on the floor and at some point - 6:00 to 6:30, 3:00 to 3:30, or 4:30 to 5:00 a.m. - Brandon fell out of his car seat. Bennett told Dr. Parent several different stories, none of which included him kicking Brandon off the bed. Bennett told Lewis, Brandon's mother, that Brandon had been sleeping in his car seat, which was located on the floor, when he fell out of it. Later, after Bennett had been arrested, he told Lewis that the car seat was actually on top of the bed, and he had accidently kicked it off. Bennett told Sergeant Eriksen that Brandon woke him at 2:00 a.m. wanting to be fed, and that he awoke at 5:00 a.m. to find that Brandon had fallen out of his car seat, which had been placed on the floor. Bennett said that Brandon was breathing funny, but instead of taking him to the hospital, he fell back asleep. When awoken again by Brandon, Bennett told Sergeant Eriksen that Brandon's breathing was still abnormal so he tried running water over him. Bennett later told Sergeant Eriksen that the car seat was not on the floor, but rather it had fallen off the bed. Bennett then told Sergeant Eriksen that he had accidently kicked the seat off the bed. Bennett also told Sergeant Eriksen that in addition to running water over Brandon, he shook Brandon to wake him. Bennett told Sergeant Eriksen three different possible times at which Brandon had fallen out of the car seat - at 5:00 a.m., 6:00 a.m., and closer to 7:00 a.m. Finally, it was not until his trial started that Bennett claimed the bedding had suffocated Brandon. Bennett was never able to explain the inconsistencies in his statements.

¶16.    The jury found Bennett guilty of capital murder and, on February 28, 2003, sentenced

9

him to death. His post-trial "Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial" was denied on April 11, 2003. Bennett now appeals to this Court, *in forma pauperis*, represented by the Mississippi Office of Capital Defense Counsel, and raises the following fifteen assignments of error:

I.     Whether the trial court abused its discretion in overruling Bennett's objection to the State's use of a jury questionnaire as the State has no right to an impartial jury and, *a fortiori*, must have an even lesser right than the capital Defendant to submit a jury questionnaire.

II.     Whether the trial court erred in refusing to accept the guilty plea.

III.     Whether the trial court erred in removing for cause a juror qualified to serve under Constitutional standards.

IV.     Whether trial counsel rendered ineffective assistance of counsel in the jury selection process by failing to exercise peremptory challenges to remedy the denial of cause challenges.

V.     Whether the trial court erred in not enforcing the rule of sequestration.

VI.     Whether the trial court erred in denying Bennett the right to present a defense.

VII.     Whether the trial court erred in allowing the admission of autopsy photographs offered solely for the purpose of arousing passion and prejudice in the jury.

VIII.     Whether the trial court erred in allowing the State to improperly cross-examine Dr. Emily Ward on irrelevant matters.

IX.     Whether the trial court erred in denying Instructions D-7 and D-8 during the culpability phase of the trial.

X.     Whether the evidence is insufficient to prove that Devin Bennett is guilty of capital murder.

10

XI. Whether Mississippi Code Annotated Section 97-3-19(2)(f) is unconstitutional in general and as applied in this case.

XII. Whether the death sentence must be vacated because the indictment failed to charge a death penalty-eligible offense.

XIII. Whether the trial court erred in refusing to allow defense counsel to argue a relevant mitigating factor that was supported by the evidence.

XIV. Whether the trial court erred in allowing the jury to consider the aggravators of child abuse and especially heinous, atrocious or cruel, which the jury used in support of a sentence of death, denying Bennett a reliable sentence as guaranteed by the United States and the Mississippi Constitutions.

XV. Whether the trial court's limiting instruction of the especially heinous, atrocious or cruel aggravating circumstance was itself unconstitutionally vague and overbroad.

## STANDARD OF REVIEW

¶17. The standard for this Court's review of an appeal from a capital murder conviction and death sentence is abundantly clear. Death penalty cases must withstand "heightened scrutiny." *Balfour v. State*, 598 So.2d 731, 739 (Miss. 1992) (citing *Smith v. State*, 499 So.2d 750, 756 (Miss. 1986); *West v. State*, 485 So.2d 681, 685 (Miss. 1985)). This higher level of scrutiny requires that all doubts be resolved in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Balfour*, 598 So.2d at 739 (quoting *Irving v. State*, 361 So.2d 1360, 1363 (Miss. 1978). *See also Fisher v. State*, 481 So.2d 203, 211 (Miss. 1985).

11

## DISCUSSION

### I.    JURY QUESTIONNAIRE

¶18.    Bennett first takes issue with the practice of allowing the State to send a questionnaire to prospective jurors prior to the trial to assist with voir dire.  On February 7, 2003, the State filed a motion seeking permission to send a questionnaire to prospective jurors.  The court granted the State's motion over Bennett's objection.  Bennett points out that this Court has held that defendants do not have a right to submit a juror questionnaire.  Thus, Bennett argues, the State should suffer the same prohibition.  Accordingly, Bennett contends that the trial judge abused his discretion in allowing the State to use a jury questionnaire when criminal defendants are not allowed to do the same.  Bennett's argument must fail for two reasons.

¶19.    First, Bennett failed to raise this issue at trial and is thus barred from doing so on appeal.  *See Moawad v. State*, 531 So.2d 632, 634 (Miss. 1998) (trial judge cannot be put in error on matter not presented to him for decision).  *See also Howard v. State*, 507 So.2d 58, 63 (Miss. 1987).

¶20.    In addition to the procedural bar, Bennett's first issue is without merit.  Bennett incorrectly asserts that *Hooker v. State*, 716 So.2d 1104 (Miss. 1998) and *Holland v. State*, 705 So.2d 307 (Miss. 1997), stand for the proposition that criminal defendants are *prohibited* from submitting jury questionnaires.  *Hooker* instead holds that Mississippi case law does not provide parties with an "absolute right to submit a jury questionnaire." *Holland*, 705 So.2d at 1115.  *Hooker* did not hold that the defendant is prohibited from using a jury questionnaire.

¶21.   While noting that there is no "absolute right" to the use of a jury questionnaire, this Court in *Hooker* nevertheless conducted a substantive review of whether the defendant suffered any prejudice by his inability to submit a questionnaire, and it concluded that the court's denial of his request was not improper.  *Id*.  Similarly, in *Holland*, this Court found that the defendant had been given sufficient opportunity to *voir dire* the jury and thus was not prejudiced by the court's decision to deny the request for a jury questionnaire.  705 So.2d at 337.

¶22.   As this Court found in *Holland*, a trial judge cannot be found to have abused his or her discretion in denying a request for a jury questionnaire when there is no rule requiring one. *Id*.  Bennett has presented no authority showing defendants are absolutely prohibited from issuing a jury questionnaire.  *See Roberson v. State*, 595 So.2d 1310, 1318 (Miss. 1992) (counsel required to support positions with reasons and authorities).  This lack of authority combined with his inability to show prejudice causes Bennett's claim to fail on the merits. Furthermore, this Court is not even faced with the possibility of prejudice to the defendant resulting from the trial court's denial of his request for a questionnaire because he never made such a request.  Instead, Bennett's complaint is that the State should not have been allowed to use the questionnaire because he could not request one.  Because Bennett incorrectly asserts that he was absolutely prohibited from requesting a questionnaire under Mississippi law, this issue is without merit.

13

## II. GUILTY PLEA

¶23. Bennett claims the trial court erred in refusing to accept his plea to the lesser included offense of heat of passion manslaughter. Bennett argues the court's refusal was based on the erroneous belief that Bennett was required to admit each fact that the State proffered.

¶24. Before a trial court "may" accept a plea of guilty, the court must determine that the plea is voluntarily and intelligently made and that there is a factual basis for the plea. UCRCCP 3.03(2); *Brown v. State*, 533 So.2d 1118, 1124 (Miss. 1988). A "criminal defendant has no absolute right to have his guilty plea accepted," and the court "may decline to accept such plea in the exercise of sound judicial discretion." *Williamson v. State*, 388 So.2d 168, 170 (Miss. 1980) (citing *Santobello v. New York*, 404 U.S. 257, 262, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971)); *Moody v. State*, 716 So.2d 592, 594 (Miss. 1998). *See North Carolina v. Alford*, 400 U.S. 25, 38 fn 11, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970) (a criminal defendant does not have an absolute right under the Constitution to have his guilty plea accepted). A guilty plea should "'manifest an unequivocal and knowledgeable admission of the offense charged,'" and such plea should be rejected if it is so limited or conditional that it is nothing more than "'an ambiguous expression of qualified guilt coupled with a protestation of innocence.'" *Beard v. State*, 392 So.2d 1143, 1145 (Miss. 1981) (quoting *Hulsey v. United States*, 369 F.2d 284, 287 (5th Cir. 1966)). *See Alford*, 400 U.S. at 38 (guilty pleas coupled with claims of innocence should not be accepted unless there is a factual basis for the plea). Again, this assignment of error must fail for two reasons.

¶25.    First, Bennett did not provide a factual basis for his plea. He refused to admit that he inflicted the head trauma which the State intended to prove caused Brandon's death. The trial court gave Bennett every opportunity to meet the requirements for an acceptable guilty plea during a hearing on February 13, 2003. After determining that Bennett understood the nature and consequences of pleading guilty to manslaughter and that he was waiving certain constitutional rights, the court read the guilty plea to Bennett. Bennett informed the court that he had read and signed the plea, which stated, "on or about August 25, 2000, you did kill Brandon Allen Bennett without malice in the heat of passion, but in a cruel or unusual manner and without authority of law and not in necessary self-defense, all of that occurring in Rankin County, Mississippi." The court then recited the factual basis for the plea, which included language that the "defendant shook the baby and threw him to the floor." At this point, Bennett informed the court that he disagreed with the factual basis for the plea. Bennett's counsel clarified that Bennett would "admit he shook the baby, but not that he threw him to the floor." The State objected, asserting that Brandon's head injury - the cause of death - did not come from the shaking but rather from blunt force trauma. When the trial court attempted to resolve this discrepancy, Bennett maintained that he found Brandon on the floor not breathing, and all he did was pick him up and shake him to get him to start breathing.

¶26.    At this point, the trial judge informed the parties that he did not think he could accept the plea due to Bennett's refusal to agree with the underlying factual basis. The trial court noted that what Bennett admitted was insufficient to convict him of the crime of heat of

15

passion manslaughter. Following further discussion, Bennett asked to address the court and stated that he agreed to the terms. The court informed Bennett that he was to state exactly what he was agreeing that he did. Bennett then stated, "I shook my child." Upon further questioning, Bennett again refused to admit that he threw the baby to the floor.

¶27. The trial court's refusal to accept Bennett's guilty plea was not error. Bennett refused to admit he inflicted the blunt force head trauma that caused his son's death. Considering Bennett's limited admission together with the pre-trial documentary evidence, the court properly determined that Bennett had failed to admit sufficient facts to justify heat of passion manslaughter.

¶28. Additionally, a criminal defendant has no absolute right to plead guilty to a lesser included offense. *Alford*, 400 U.S. at 38. Thus, the trial judge did not abuse his discretion in refusing to accept such a plea.

### III. REMOVAL OF JUROR FOR CAUSE

¶29. Bennett's third assignment of error claims that Juror Number Nine was improperly struck for cause. The juror stated that she would not impose the death penalty unless she was convinced of Bennett's guilt, and she would require more than beyond a reasonable doubt. Bennett asserts that requiring the State to make a case for imposing death based on this "greater than beyond reasonable doubt" standard did not make Juror Number Nine ineligible to serve on the jury. Once again, Bennett's argument fails because it is both procedurally barred and without merit.

16

¶30. Bennett failed to object to the State's challenge of Juror Number Nine for cause. Therefore, Bennett is barred from doing so now on appeal. *Moawad*, 531 So.2d at 634 (trial judge cannot be put in error on a matter not presented to him for decision). This assignment of error is procedurally barred from review by this Court. *Howard*, 507 So.2d at 63.

¶31. Bennett's claim is also without substantive merit. "The determination of whether a juror is fair and impartial is a judicial question" that will not be set aside unless there is a finding that "such determination clearly appears wrong." *Carr v. State*, 555 So.2d 59, 60 (Miss. 1989). "A trial judge does not commit reversible error by excusing for cause a prospective juror 'who gave contradictory responses, wavered on their position, and generally appeared confused regarding the death penalty issue'." *Scott v. State*, 878 So.2d 933, 960 (Miss. 2004) (quoting *King v. State*, 784 So.2d 884, 888 (Miss. 2001)).

¶32. We cannot find the trial court abused its discretion in striking Juror Number Nine for cause. Her answers reflected inconsistency, and although she agreed to follow the law, her agreement was belied by statements that indicated she could not do so. The court initiated the individual voir dire of Juror Number Nine by asking her if she had "any conscientious scruples against infliction of the death penalty when the law authorizes it in a proper case and where the testimony warrants it." Noting that it was a hard question and that she was somewhat unsure, Juror Number Nine stated that if she felt Bennett was found guilty beyond a reasonable doubt, she could vote for the death penalty. She then qualified her answer, stating that she had to "truly believe that they were guilty" before she could vote for death.

17

After additional voir dire by the State, Juror Number Nine responded that she would have to be sure Bennett was guilty "beyond any reasonable doubt whatsoever." When the State attempted to clarify her position, Juror Number Nine stated that in order to inflict the death penalty, she would have to be convinced even higher than beyond a reasonable doubt. The State concluded its initial *voir dire* of Juror Number Nine by securing admissions from her that before she could impose the death penalty, the State would have to prove that Bennett was guilty beyond all doubt, that Bennett intended to kill Brandon, and that Bennett intended to kill Brandon beyond all doubt.

¶33. Despite Bennett's counsel's attempt to rehabilitate Juror Number Nine, her statements only continued to indicate her inability to follow the law. Juror Number Nine was never able to reconcile her promise to follow the law with her steadfast requirement that the State meet a burden of proof higher than the law demands. Thus, we find that this assignment of error is without merit.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL REGARDING PEREMPTORY CHALLENGES

¶34. Bennett next claims his trial counsel was ineffective for failing to use available peremptory strikes on the last three jurors seated, each of whom Bennett says "expressed views on the death penalty that rendered them unfit to serve on the jury." One of the jurors stated that if Bennett "is convicted of capital murder, he should receive death." Another juror stated, "I believe in an eye for an eye. If you pay for your crime swiftly, then the prison system would not be overcrowded." The third challenged juror stated, "I believe if one person

18

murders another, he should get the death penalty if it's proven." We are again faced here with an assignment of error that both lacks merit and is procedurally barred.

¶35. Evaluation of ineffective assistance of counsel claims is controlled by *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 674 (1984), which requires defendants making the claim to demonstrate not only that their counsel was ineffective, but also that the ineffective representation resulted in prejudice. *Id*. "'Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'" *Stringer v. State*, 454 So.2d 468, 477 (Miss. 1984) (quoting *Strickland*, 466 U.S. at 687). This Court must focus on whether trial counsel's assistance was reasonable considering all circumstances, bearing in mind there is no constitutional right to errorless counsel. *See Mohr v. State*, 584 So.2d 426, 430 (Miss. 1991).

¶36. Trial counsel is faced with many decisions in the course of representing a defendant, particularly one charged with a capital crime. The decision to file a particular motion, call a particular witness, ask a particular question, or object to a particular question, falls within the discretion of planning and developing a trial strategy. *Cole v. State*, 666 So.2d 767, 777 (Miss. 1995) (citing *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984)). So it is counsel's decision to use or forego peremptory strikes.

¶37. Bennett's post trial challenge of his counsel's decision not to strike the three jurors includes no showing that these jurors were not fair and impartial. Bennett's counsel

questioned each juror individually. Based on the record, each of these jurors appears to have taken their job seriously, stated with certainty that they could be fair and impartial, and resolved any questions concerning their opinions of the death penalty.

¶38. Juror thirty-six informed the court that he would be fair and impartial and would consider all sentencing options presented to him. When asked by defense counsel about his statement on the jury questionnaire indicating that if the defendant was convicted of capital murder he should receive death, juror thirty-six informed the court that he had hastily filled out the jury form and had since formed a more considered opinion regarding sentencing.

¶39. Juror thirty-eight noted on her jury questionnaire that she believed in "an eye for an eye." However, during voir dire, she stated that she would not automatically choose the death penalty even if the victim was a child. Juror thirty-eight explained that her "eye for an eye" comment meant that a person should pay for their crime but not necessarily in the same manner of punishment. Juror thirty-eight also told the court that she would follow instructions and would consider the required factors.

¶40. Finally, juror thirty-nine noted on her questionnaire that "if it's proven," a person should get the death penalty if he murdered someone. During her individual voir dire, juror thirty-nine stated that she would not automatically vote for the death penalty and that she would consider all sentencing options. Juror thirty- nine explained that she had filled out the questionnaire prior to learning how the legal process for a murder trial worked and prior to learning what the law required her to consider with respect to evidence and sentencing.

20

¶41. Bennett has not shown how his trial counsel was ineffective for failing to strike these three jurors. All three jurors indicated they could be fair and impartial; that they would not automatically impose the death penalty; and that they would base their verdict on the evidence presented under the control of the law on which they were instructed. Furthermore, as the State notes, defense counsel was clearly diligent and thorough throughout voir dire. The voir dire consumed five volumes of transcript, and included individual and group voir dire. Bennett's counsel questioned each juror to be sure he or she was qualified to sit on a death penalty case. Counsel made challenges for cause, successfully defended against the State's cause challenges, and struck nine jurors peremptorily. Bennett has wholly failed to demonstrate his counsel was ineffective or that he was prejudiced by any alleged ineffective assistance.

¶42. Additionally, Bennett's claim is procedurally barred. He provides us with no evaluation of his claim pursuant to *Strickland*, nor does he cite any authority for the proposition that trial counsel's decision to refrain from exercising peremptory challenges constitutes ineffectiveness of counsel. As a result of Bennett's failure to cite to controlling authority, this issue is waived. *See Roberson*, 595 So. 2d at 1318.

¶43. Thus, for the reasons stated, Bennett's fourth assignment of error is without merit and procedurally barred.

## V.    THE RULE OF SEQUESTRATION

¶44.    Bennett claims the trial court improperly allowed the jurors to individually attend the movies during free time after the trial had begun.  Bennett asserts such action violated the rule of sequestration, thus mandating reversal of his conviction.  This claim is also without merit as the record does not support Bennett's contentions.

¶45.    The record indicates that the two bailiffs assigned to the jury were given strict instructions regarding sequestration.  The jury was not allowed to watch television, listen to the radio, read the newspaper, use cellular phones, drink alcoholic beverages, or speak to family members during the trial.  The record does not indicate whether the jurors attended a movie during their free time, but merely includes the judge's comments that, seeing no objection from either counsel, he would allow the jurors to go to the movies under certain conditions.  Such conditions included accompaniment of jurors by both bailiffs and the requirement that jurors would have to all vote to attend the same movie.  The record does not indicate whether any jurors actually attended a movie.  Because Bennett's direct appeal is confined to the scope of the record, Bennett has failed to meet his burden of including all necessary items for appeal in the record itself.  *See* *Jones v. State*, 776 So.2d 643, 649 (Miss. 2000); *Branch v. State*, 347 So.2d 957, 959 (Miss. 1977).

¶46.    Alternatively, this claim is without substantive merit.  The principle of sequestration in capital cases "is to insure a fair and impartial jury that will return a verdict beyond reproach."  *Simmons v. State*, 805 So.2d 452, 506 (Miss. 2001).  Bennett presents no

22

authority to support his contention that a conviction must be reversed simply because sequestered jurors attended a movie. This issue is without merit.

## VI. RIGHT TO PRESENT DEFENSE

¶47. Bennett next claims the trial court erred in granting the State's motion to exclude evidence concerning specific instances of Bennett's character towards Brandon prior to his death. During the trial, the State presented a Motion in Limine to prevent Bennett's witness, Yolanda Lewis, from testifying that Bennett was a loving father who would not have hurt Brandon.

¶48. Lewis's proffered testimony was that Bennett attended birthing classes and doctor's visits; that Bennett was with Lewis at Brandon's birth; and that Bennett saw Brandon regularly. Lewis further planned to testify that she never saw Bennett abuse Brandon. While Bennett claimed Lewis was merely a "fact witness" who was not testifying as to Bennett's character, the State argued that Lewis's testimony included specific acts of character inadmissible under the Mississippi Rules of Evidence.

¶49. Lewis's proffered testimony amounted to proof of specific instances of good character, and it was properly excluded under Mississippi Rule of Evidence 404(a)(1). This rule prohibits the accused from offering evidence of his good character to prove he acted in a certain way during the period in question. A defendant's introduction of character evidence to suggest that he or she is not the type of person who would commit a crime is most often governed by Mississippi Rule of Evidence 405(a). Under this rule, a party is limited to proof

23

of character on direct examination through testimony as to reputation or opinion only. Miss. R. Evd. 405(a). In *Winters v. State* this Court held that, while a defendant may introduce evidence of good character, "[p]roof of a character trait . . . may not be made by proof of specific past actions. The defendant is limited to offering testimony as to general reputation." 449 So.2d 766, 768 (Miss. 1984) (citing *Kearney v. State*, 8 So.2d 292, 293 (Miss. 1890)).

¶50. Bennett suggests that Lewis's testimony was evidence to negate his intent to kill Brandon. Bennett, however, did not have to disprove intent, because the State was not required to prove it under the elements of capital murder by which the killing can be "with or without deliberate design." Also, Bennett's position at trial was that Brandon's death was an accident. As such, the character of the accused is irrelevant. Because Bennett's witness was offered to testify to specific acts in order to prove Bennett's character, the testimony was properly barred. Thus, Bennett's claim is without merit.

## VII. AUTOPSY PHOTOGRAPHS

¶51. Bennett's seventh assignment of error alleges that the trial court improperly admitted autopsy photographs of the victim. Bennett argues the photos were admitted only to inflame the jurors, thus requiring reversal of his conviction. The State points out, however, that the cause and manner of Brandon's death was an issue before the jury. The pictures assisted the experts in establishing the cause of death, that is, whether Brandon died as a result of the shaking or trauma to the head from a fall. Before ruling the photos admissible, the trial court required the State to lay a proper foundation.

24

¶52.    During his examination, Dr. Hayne qualified each photo, one at a time, as a "true and accurate" representation of how Brandon's injuries appeared during the autopsy.  Dr. Hayne used Exhibit 14 to show an area of bruising over the left side of the forehead and left temple.  Dr. Hayne used one of the photos to testify about a half-inch abrasion over the back of Brandon's head.  Dr. Hayne used another photograph to show bruising on the right side of Brandon's head as well as on his cheeks.  Dr. Hayne used other photographs to testify about an injury over Brandon's elbow and an injury over his forearm, bruises on Brandon's upper and lower back, specific internal injuries on the left side of Brandon's head which appeared as a large collection of blood in the scalp area, extensive bruising on the skull itself, the exact areas of bleeding that produced the bruises on Brandon's brain, and injuries to Brandon's brain including the areas of "subarachnoid hemorrhage."

¶53.    "[P]hotographs, whether original or copies, are admissible as primary evidence upon the same grounds and for the same purposes as are diagrams, maps and drawings of objects or premises." *Ledbetter v. State*, 233 So.2d 782, 785 (Miss. 1970) (citing *Willette v. State*, 80 So.2d 836, 842 (Miss. 1955)).  Photographs that aid in describing the circumstances of the killing, the location of the body and cause of death, or that supplement or clarify a witness's testimony have evidentiary value and are admissible before a jury.  *Neal v. State*, 805 So.2d 520, 524 (Miss. 2002) (citations omitted).  Admission of photos of a deceased is within the sound discretion of a trial court and is proper so long as the photos serve some useful, evidentiary purpose.  *Jackson v. State*, 672 So.2d 468, 485 (Miss. 1996); *Mackbee v. State*,

25

575 So.2d 16, 31 (Miss. 1990); *Griffin v. State*, 557 So.2d 542, 549 (Miss. 1990); *Boyd v. State*, 523 So.2d 1037, 1040 (Miss. 1988). The discretion of a trial judge to admit photos in criminal cases, "'runs toward almost unlimited admissibility regardless of gruesomeness, repetitiveness, and the extenuation of probative value.'" *Woodward v. State*, 726 So.2d 524, 535 (Miss. 1997) (quoting *Brown v. State*, 690 So.2d 276, 289 (Miss. 1996)).

¶54. The disputed photographs in this case have considerable probative value, and we cannot say the trial judge abused his discretion by finding that the probative value of the photographs substantially outweighed any prejudice. Miss. R. Ev. 403. At trial, the State claimed Bennett struck Brandon's head on the floor and then shook him. Bennett claimed Brandon died from falling to the floor, having the car seat fall on top of him, or from suffocation. Bennett disputed the cause of death and the testimony of Dr. Hayne. Dr. Hayne, in turn, used the photographs to help explain his opinions and conclusions.

¶55. The record indicates the State made efforts to use the photographs only as necessary. The photographs consumed only 12 of the 120 pages of Dr. Hayne's testimony. Additionally, 6 of those 12 pages involved the introduction of the photographs, and 6 involved an actual discussion of the relevance of the pictures. During the remainder of Dr. Hayne's testimony, the State chose to use diagrams of the body, models of the brain and skull, and drawings of the eyes. We find no evidence the State attempted to use the photographs in a prejudicial manner.

¶56. When compared to photographs found admissible in other cases, the photographs in

this case are not overly gruesome or shocking. This Court has upheld the admission of photos depicting child victims. *Jackson v. State*, 684 So.2d 1213, 1230-31 (Miss. 1996) (affirming the admission of photos of four dead children stabbed in the neck, chest, and face). The most often cited case wherein this Court held the photos to be so gruesome and inflammatory as to be inadmissible is *McNeal v. State*, 551 So.2d 151 (Miss. 1989). In *McNeal*, this Court held that close-up photos depicting a partly decomposed, maggot-infested-skull were so horrible that the trial judge abused his discretion in admitting them. *Id*. at 159. While not pleasant to view, the photos of Brandon do not rise to the level of those found in *McNeal*. For the reasons stated, we find this assignment of error is without merit.

## VIII. CROSS EXAMINATION OF DR. EMILY WARD

¶57. Bennett next claims the trial court erred in allowing the State to ask his expert, Dr. Emily Ward ("Dr. Ward"), why she left the coroner's office in Mississippi. Bennett argues that Dr. Ward's reasons for leaving in no way reflect on her credibility or qualifications and are completely unrelated to the facts of the case. Thus, Bennett reasons, such prejudicial questioning by the State necessitates reversal of his case.

¶58. The scope of cross examination is largely within the discretion of the trial court. Cross examination "may proceed into the collateral circumstances surrounding, or in any way affecting, the transaction to the full extent that they have relevant connection by way of testing the memory, accuracy, sincerity, interest, or bias of the witness." *Byrom v. State*, 863 So.2d 836, 896-97 (Miss. 2003). Wide latitude is allowed in cross examination to show bias or

27

motive for the purpose of affecting credibility. *Id*.

¶59. The State claims its questions were proper attempts to inquire into the biases and credibility of Dr. Ward, as well as her independent credibility as a coroner in the case. Dr. Ward was hired to conduct an examination of the victim's body, but she never examined Bennett himself. During cross examination, however, Dr. Ward repeatedly stated that Bennett was confused and upset about what happened to his son, therefore implying he could not have committed the crime.

¶60. Also, Dr. Ward appears to have been a difficult and uncooperative witness, causing the trial court to admonish her on several occasions to answer the questions and stop arguing with the prosecution. As Dr. Ward's testimony continued, she refused to admit she was hired by the defense, and it took the State nearly six pages of trial record to have her admit she was hired to conduct an autopsy. At this point in the examination, the State asked Dr. Ward if she was Mississippi's medical examiner at the time she conducted the autopsy. Dr. Ward stated that she had been the state's medical examiner, but she had chosen to leave the position. The State then asked Dr. Ward if it was true that she had to leave the position because the county coroners of Mississippi requested she do so and even petitioned the governor for her resignation. Dr. Ward denied such allegations but stated that the letter sent to the governor "was originated by Dr. Hayne's cohort . . . . " Dr. Ward's hostile characterization of Dr. Hayne was used by the State to show that Dr. Ward blamed Dr. Hayne for threats to her previous job.

¶61.    Bennett cites cases wherein questioning was intended solely to embarrass the witness and was immaterial to the issues before the court.  *See Fishboats, Inc. v. Welzbacher*, 413 So.2d 710, 719 (Miss. 1982) (noting that "[q]uestions intended to embarrass or humiliate a witness as well as those extending to irrelevant matters, are not permissible."); *Tippit v. Hunter*, 205 So.2d 267, 273 (Miss. 1967) (holding that "wholly immaterial evidence may not be elicited from the witness on cross-examination.").

¶62.    The State's questioning of Dr. Ward was entirely proper.   Bias, prejudice and credibility are always in issue, and the State's questions were proper attempts to inquire into Dr. Ward's personal feelings about Dr. Hayne and her forthrightness in the reasons for leaving her employment.  Wide latitude is permitted in cross-examination to show bias or motive and the affect on a witness's credibility.  *See Byrom*, 863 So. 2d at 896-97.  This assignment of error is without merit.

## IX.    DENIAL OF JURY INSTRUCTIONS D-7 and D-8

¶63.    Bennett's ninth assignment of error asserts the trial court erred in denying jury instructions D-7 and D-8, both circumstantial evidence instructions.  Instruction D-7 would have informed the jury as follows:

> The court instructs the jury that if the State has relied on circumstantial evidence to establish its theory of guilt of Devin Allen Bennett, then the evidence for the State must be so strong as to establish the guilt of Devin Allen Bennett, not only beyond a reasonable doubt, but the evidence must be so strong as to exclude every other reasonable hypothesis other than that of guilt.

¶64.    Instruction D-8 would have informed the jury as follows:

29

The court instructs the jury that if there be a fact or circumstance in this case which is susceptible to two interpretations, one favorable and the other unfavorable to Devin Allen Bennett, and if after considering all the other facts and circumstances there is a reasonable doubt regarding the correct interpretation, then you, the jury, must resolve such doubt in favor of the accused, and place upon such fact or circumstance the interpretation most favorable to Devin Allen Bennett.

¶65. According to the Bennett, because he never admitted any element of the offense charged, the case was wholly circumstantial and the jury should have been instructed as such. The State submits that this case was not a purely circumstantial evidence case, but rather involved both circumstantial and direct evidence. Therefore, the State claims a circumstantial evidence instruction was not required.

¶66. Circumstantial evidence cases lack direct evidence, and they include cases where the state is "without a confession and wholly without eyewitnesses to the gravamen of the offense charged." *Kniep v. State*, 525 So.2d 385, 392 (Miss. 1988) (citations omitted). But where the accused has made an admission on an element of the offense, the case is no longer circumstantial such that a circumstantial evidence instruction is required. *Lynch v. State,* 877 So.2d 1254, 1264 (Miss. 2004); *Conner v. State*, 632 So.2d 1239, 1256 (Miss. 1993); *Mack v. State*, 481 So.2d 793, 795 (Miss. 1985). Nor is the defendant entitled to a circumstantial evidence instruction where both circumstantial and direct evidence are admitted at trial. *Smith v. State*, 897 So.2d 1002, 1009 (Miss. Ct. App. 2004) (citing *Gilleylen v. State*, 255 So.2d 661, 663 (Miss. 1971)).

¶67. In addition to direct scientific evidence such as fingerprints and DNA, "[d]irect

30

evidence has been held to include evidence such as eyewitness testimony, the defendant's confession to the offense charged, or the defendant's admission as to an important element thereof." *Turner v. State*, 910 So.2d 598, 603 (Miss. Ct. App. 2005) (citing *Lynch*, 877 So.2d at 1265).

¶68.    A defendant's admission to a significant element of the offense obviates the need for a circumstantial evidence instruction. *Conner*, 632 So.2d at 1256; *Mack*, 481 So.2d at 795. This "admission" was defined in *Lynch* as "'a statement by the accused - it may be direct or implied - of facts pertinent to the issue and tending in connection with other facts to prove his guilt.'" 877 So.2d at 1265 (quoting *Mack*, 481 So.2d at 795). While not a confession *per se*, an admission of a significant element of the offense is direct evidence of guilt. *See Swinney v. State*, 829 So.2d 1225, 1236-37 (Miss. 2002) (Court held that a confession to a shooting could be direct evidence to an underlying felony for capital murder purposes where defendant admitted to pointing the gun at the victim and stated the gun accidently fired).

¶69.    Bennett admitted to Sergeant Erikson that he shook Brandon and that he could have kicked Brandon off the bed. Although Bennett asserted he did not intend to hurt Brandon, he affirmatively stated, "I shook [Brandon] too hard." The State correctly asserts that while Bennett claimed Brandon's death was accidental, he also claimed responsibility for the injuries to the child. Bennett's statements constitute an admission, and this admission obviates the need for a circumstantial instruction. The trial court did not err in denying Instructions D-7 and D-8. Thus, Bennett's assignment of error is without merit.

## X.    MOTION FOR DIRECTED VERDICT

¶70.    Bennett next claims the trial court erred in denying his motion for directed verdict on the charge of capital murder.  According to Bennett, because his expert witness, Dr. Ward, testified Brandon's death was accidental and the State's expert agreed that this diagnosis was possible, the evidence was insufficient for a jury to find him guilty of capital murder.

¶71.    This Court's standard of review for a post-trial motion is abuse of discretion.  ***Howell v. State***, 860 So.2d 704, 764 (Miss. 2003).  When reviewing the trial court's denial of a motion for directed verdict, we "consider[] all of the evidence in the light most favorable to the State and give[] the State the benefit of all favorable inferences that may reasonably be drawn from the evidence."  ***Seeling v. State***, 844 So.2d 439, 443 (Miss. 2003).  Bennett's challenge to the trial court's denial of his motion for directed verdict is an attack on the sufficiency of the evidence.

¶72.    In the recent case of ***Bush v. State***, 895 So.2d 836, 843-45 (Miss. 2005), Presiding Justice Waller, speaking for a unanimous Court, clarified the distinction between the weight and the sufficiency of the evidence:

> In ***Carr v. State***, 208 So.2d 886, 889 (Miss. 1968), we stated that in considering whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows 'beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.'

***Bush v. State***, 895 So.2d at 843 (quoting ***Carr***, 208 So.2d at 889).  The ***Bush*** Court went on

to hold that "this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" ***Id.*** (quoting ***Jackson v. Virginia***, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d (1979) (emphasis in original) (quoting ***Woodby v. INS***, 385 U.S. 276, 282, 87 S. Ct. 483, 17 L. Ed. 2d 362 (1966)). Rather, the "question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ***Jackson***, 443 U.S. at 319 (emphasis in original).

¶73. We find the State met its burden of proving Bennett's guilt by presenting a combination of expert medical testimony, scientific evidence, witness evidence, and a confession from Bennett. The State submitted both of Bennett's admissions that he shook Brandon too hard and that he could have kicked Brandon off the bed. The State also submitted testimony from three medical experts who stated that to a reasonable degree of medical certainty, Brandon died from shaken baby syndrome, consisting of a combination of shaking and blunt force head trauma. The State's experts also concluded, to a reasonable degree of medical certainty, that Brandon's injuries were not caused by a fall from a car seat. Also, the State's evidence concluded that Brandon could not have injured himself. While Bennett claims the State's witnesses agreed that defense expert Dr. Ward's conclusions were possible, the State's witnesses actually stated that "in the realm of impossibility, anything is possible." The State's experts held firm that, to a reasonable degree of medical certainty, Brandon's death was the result of a homicide.

33

¶74. The State also met its burden by highlighting the numerous inconsistencies in Bennett's stories. As the State suggests in its brief, the jury had the choice of believing the State's case or of believing one of Bennett's numerous inconsistent claims, including that at some point around 2:00, or 3:00, or 4:00, or 5:00, or 6:00, or 7:00, or 8:00 a.m., Bennett's ten-week-old son, Brandon, flung himself out of a car seat that was sitting on the floor; or he flung himself out of a car seat that was sitting on the bed; or he was kicked off the bed; or the car seat hit him in the head; or the seat fell on top of him and he suffocated. The jury had the opportunity to resolve this conflicting testimony, and it is certainly reasonable to conclude that a jury could find the State's evidence more credible. After reviewing all the evidence in the light most favorable to the State, there was sufficient evidence for a jury to convict Bennett. Accordingly, we find this issue is without merit, and we will not disturb the jury's verdict.

## XI. CONSTITUTIONALITY OF MISSISSIPPI CODE ANNOTATED SECTION 97-3-19(2)(f) – PROPORTIONALITY

¶75. Bennett's eleventh assignment of error combines a claim that his sentence is disproportionate with a claim that Mississippi Code Annotated Section 97-3-19(2)(f) is unconstitutional because it allows him to be found guilty of capital murder without any proof of criminal intent to murder Brandon and without any proof of criminal intent to commit felonious child abuse, the underlying felony in this case. We shall address the latter claim first.

*Constitutionality of Mississippi Code Annotated Section 97-3-19(2)(f)*

¶76. Because Bennett failed to raise this issue at trial, he is procedurally barred from doing

so now. *See Moawad*, 531 So.2d at 634 (trial judge cannot be put in error on matter not presented to him for decision). *See also Howard*, 507 So.2d at 63.

¶77. Notwithstanding the procedural bar, the statute has passed constitutional muster in numerous previous cases. *See, e.g., Jackson v. State*, 860 So.2d 653, 666 (Miss. 2003) (statute constitutional, "notwithstanding that it does not require deliberate design"); *Faraga v. State*, 514 So.2d 295, 302 (Miss. 1987) (same). Section 97-3-19(2)(f) states that the killing of a human being shall be capital murder, "[w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to commit such felony." Miss. Code Ann. § 97-3-19 (1972). Section 97-5-39(2)(a) states that "[a]ny person who shall intentionally (i) burn a child, (ii) torture any child or, (iii) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse . . . ." Miss. Code Ann. § 97-5-39(2)(a) (1972).

¶78. In rejecting the defendant's argument that this statute was unconstitutional because it did not require deliberate design, the *Faraga* Court noted:

> [T]he intent of the Legislature was that serious child abusers would be guilty of capital murder if the child died. These are the precise facts before this Court. As this Court has stated in prior decisions, the Legislature's prerogative is to define crimes and set the punishment for offenders, and this prerogative is given great latitude.

*Faraga*, 514 So. 2d at 302. Also, in *Gray v. State*, 351 So.2d 1342, 1345 (Miss. 1977), this

35

Court held that the "with or without any design to effect death" language of Section 97-3-19(2)(e) was not unconstitutionally vague. According to *Gray*, "[t]he statute is not vague and simply defines the crime of capital murder as the killing of a human being without authority of law when engaged in the commission of the crime of kidnaping and the other felonies enumerated therein." *Id*. In upholding Section 97-3-19(2)(f), this court in *Miller v. State*, 748 So.2d 100, 103 (Miss. 1999), noted that the statute upheld in *Gray* was similarly worded to (2)(f) but dealt with different crimes. Therefore, this Court has repeatedly rejected the argument that this statute is unconstitutional, and Bennett has failed to provide sufficient authority to overrule our prior holdings. Thus, aside from the procedural bar, Bennett's claim is without substantive merit.

*Proportionality*

¶79.    Also included in his eleventh assignment of error, Bennett claims the death sentence in his case is a disproportionate and excessive punishment for the offense committed. This Court's determination of whether a death sentence is excessive or disproportionate to the penalties in similar cases is made by a comparison of cases in which a death sentence was imposed and reviewed on appeal. Bennett cites no cases which support his claim that his death sentence for murdering a ten-week old child is excessive or disproportionate. This Court has previously upheld the death penalty in cases involving capital murder during the commission of felonious child abuse. *See Brawner v. State*, 872 So.2d 1, 17 (Miss. 2004) (death sentence proportionate where defendant shot daughter to death); *Stevens v. State*, 806

36

So.2d 1031, 1064 (Miss. 2001); **Brown**, 690 So.2d at 298; **Jackson**, 684 So.2d at 1240.

Bennett was found guilty of killing Brandon during the commission of felonious child abuse.

Bennett has presented no evidence or authority to prove that the death sentence in this case

violated Mississippi Code Annotated Section 99-19-105. As a result, Bennett's assignment

of error is without merit.

### XII. INDICTMENT

¶80.  Bennett next claims the indictment in this case failed to include all necessary elements

to impose a death sentence. Bennett claims that any fact increasing the maximum penalty for

a crime (including aggravators) must be charged in an indictment, submitted to a jury, and

proven beyond a reasonable doubt. Bennett asserts that the maximum penalty for capital

murder in Mississippi is life imprisonment and, unless a sentencing hearing is held, the death

penalty is not an option. Because Bennett failed to raise this issue at trial, he is procedurally

barred from doing so on appeal. *See* **Moawad**, 531 So.2d at 634 (trial judge cannot be put in

error on matter not presented to him for decision). *See also* **Howard**, 507 So.2d at 63.

Therefore, this assignment of error is procedurally barred from review by this Court.

Alternatively, this claim is without substantive merit.

¶81.  Bennett incorrectly implies that the maximum penalty for capital murder in Mississippi

is life imprisonment. Our Legislature has determined that the maximum penalty for capital

murder in Mississippi is death. Mississippi Code Annotated Section 1-3-4 states; "[t]he term

'capital murder' when used in any statute shall denote criminal cases, offenses and crimes

37

punishable by death, or imprisonment for life in the state penitentiary." Once Bennett was indicted for capital murder, he was immediately eligible upon conviction for the maximum sentence of death. *See* Miss. Code Ann. § 99-19-101(1)(1972) (setting forth capital sentencing procedures to be employed upon conviction or adjudication of guilt of a defendant for capital murder).

¶82.    Bennett cites ***Apprendi v. New Jersey***, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L.Ed. 2d 485 (2000), for the rule that any fact that increases the penalty of a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. ***Apprendi*** holds that the Fourteenth Amendment to the United States Constitution requires that a jury, on the basis of proof beyond a reasonable doubt, make a factual determination authorizing an increase in the maximum penalty. *Id*. ***Apprendi*** is inapplicable to Bennett's case because in Mississippi, death is the statutory maximum, and the penalty is submitted to the jury for a determination beyond a reasonable doubt. Furthermore, the jury in Bennett's case found the aggravating circumstances beyond a reasonable doubt pursuant to Mississippi Code Annotated Section 99-19-103.

¶83.    Bennett's claim that, pursuant to the decisions in ***Apprendi*** and ***Ring v. Arizona***,536 U.S. 584, 122 S.Ct. 2428, 153 L. Ed. 2d 556 (2002), the statutory aggravators and *mens rea* element must be specifically pleaded in the charging indictment of state court case also fails. Neither ***Ring*** nor ***Apprendi*** stand for this proposition, and the United States Supreme Court in both decisions specifically held it was not addressing the question of whether the

aggravators must be included in the indictment. *See Apprendi*, 530 U.S. at 477 fn.3. The Supreme Court has continued to follow the position that indictment issues in federal courts are governed by the Fifth Amendment, while indictment issues in state courts are instead governed by state law. Mississippi law does not require the aggravating circumstances to be set forth in the indictment. *See Smith v. State*, 729 So.2d 1191, 1224 (Miss. 1998); *Smith v. State*, 724 So.2d 280, 296 (Miss. 1998); *In re Jordan*, 390 So.2d 584, 585 (Miss. 1980). Rather, being indicted for capital murder puts a defendant on notice of the aggravating circumstances that may be used against him. *Williams v. State*, 445 So.2d 798, 804-05 (Miss. 1984).

¶84. However, under Mississippi law, the underlying felony that elevates the crime to capital murder must be identified in the indictment along with the section and subsection of the statute under which the defendant is being charged. *See* Miss. Code Ann. § 99-17-20. Thus, although it is not required under federal or Mississippi law, the indictment in this case included one of the aggravating circumstances.

¶85. Furthermore, this Court has repeatedly rejected similar arguments based on *Ring* and *Apprendi*, holding both of them inapplicable to Mississippi's capital sentencing scheme. In *Stevens v. State*, 867 So.2d 219, 227 (Miss. 2003), this Court held that the "defendant is not entitled to formal notice of the aggravating circumstances to be employed by the prosecution" and that any time an individual is charged with murder, he is put on notice that the death penalty may result. Additionally in *Brown v. State*, 890 So.2d 901, 918 (Miss. 2004), this

39

Court rejected the argument that *Ring* and *Apprendi* require aggravators to be included in a state court indictment. *See also* **Knox v. State**, 901 So.2d 1257, 1269 (Miss. 2005); **Gray v. State**, 887 So.2d 158, 174 (Miss. 2004) ("Thus, the issue of the omission of aggravating circumstances in the indictment is without merit."); **Mitchell v. State**, 886 So.2d 704, 711 (Miss. 2004); **Berry v. State**, 882 So.2d 157, 173 (Miss. 2004); **Puckett v. State**, 879 So.2d 920, 946 (Miss. 2004); **Holland v. State**, 878 So.2d 1, 9 (Miss. 2004); **Simmons v. State**, 869 So.2d 995, 1010 (Miss. 2004); **Stevens**, 867 So.2d at 227 ("The State is correct in its assertion that a defendant is not entitled to formal notice of the aggravating circumstances to be employed by the prosecution and that an indictment for capital murder puts a defendant on sufficient notice that the statutory aggravating factors will be used against him."). For the reasons stated, we find Bennett's indictment was sufficient, and his claim is without merit.

### XIII. REFUSAL TO ALLOW THE OFFER OF PLEA AS A RELEVANT MITIGATING FACTOR

¶86. Bennett's thirteenth assignment of error is that the trial court refused to allow his counsel to argue, at closing, that Bennett had been offered a plea bargain. Bennett claims the State's offer to plea bargain is admissible at sentencing as evidence of mitigation, and the judge's refusal to allow the introduction of this evidence requires reversal. Bennett, however, has failed to cite to a single case holding that offers of plea bargains must be admitted at sentencing, or that failure to allow evidence of a plea bargain offer is an abuse of discretion by the trial court judge. Failure to cite to relevant authority results in a waiver of the issue on appeal. **Simmons**, 805 So.2d at 487.

¶87. Bennett's issue is also without substantive merit. A jury should be allowed to consider, as mitigation, "any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." ***Lockett v. Ohio***, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). The trial court did not violate ***Lockett*** and did not err in refusing to allow evidence of defendant's plea offer. Bennett's plea offer is neither mitigation evidence of his character nor part of the circumstances of the crime for which Bennett was convicted. Accordingly, this issue is without merit.

## XIV. HEINOUS, ATROCIOUS OR CRUEL AGGRAVATORS

¶88. Bennett next claims the trial court erred in allowing the jury to consider two aggravators: 1) "the capital offense was committed while Bennett was engaged in the commission of felonious child abuse," and 2) "the capital offense was especially heinous, atrocious or cruel." Bennett asserts that because the heinous, atrocious or cruel ("HAC") aggravator wholly subsumed the child abuse aggravator, the two should not have been submitted together. Bennett, however, failed to raise this issue at trial. Accordingly, he is procedurally barred from doing so on appeal. *See **Moawad***, 531 So.2d at 634 (trial judge cannot be put in error on matter not presented to him for decision). *See also **Howard***, 507 So.2d at 63. Bennett also failed to cite to any relevant authority in support of his allegation that the felonious child abuse aggravator is wholly subsumed by the HAC aggravator. Therefore, again, this assignment of error is procedurally barred from review by this Court.

41

*Roberson*, 595 So.2d at 1318 (counsel required to support positions with reasons and authorities).

¶89.   Bennett's fourteenth assignment of error further fails on substantive merit.  Mississippi Code Annotated Section 99-19-101(5) sets forth the list of aggravators included in Mississippi's capital sentencing scheme, and felonious child abuse is included among the list of underlying felonies which double as aggravators.  Felonious child abuse is defined in Mississippi Code Annotated Section 97-5-39(2)(a) as: "[a]ny person who shall intentionally (i) burn any child, (ii) torture any child or, (iii) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm shall be guilty of felonious abuse . . . ."  The HAC aggravator is set forth by Mississippi Code Annotated Section 99-19-101(5), and the factors to consider in support of such aggravator include the length of time it takes the victim to die, the number of wounds inflicted, the factors leading up to the final killing, whether the defendant inflicted physical pain before death, the mental anguish and physical torture suffered by the victim prior to death, and the vulnerability of the victim.  *See Dycus v. State*, 875 So.2d 140, 164 (Miss. 2004); *Knox v. State*, 805 So.2d 527, 533-34 (Miss. 2002); *Stevens*, 806 So.2d at 1060; *Underwood v. State*, 708 So.2d 18, 39-40 (Miss. 1998).

¶90.   Felonious child abuse and the HAC aggravators have distinct elements, and Bennett has submitted no law prohibiting the two aggravators from being used together.  This Court has repeatedly upheld cases in which these two aggravators were submitted and found by a

42

jury. *See Stevens*, 806 So.2d at 1045, 1060 (jury instructed with both HAC aggravator and aggravator/underlying felony of child abuse); *Brown v. State*, 798 So.2d 481, 501-03 (Miss. 2001) (jury instructed with both HAC aggravator and aggravator/underlying felony of child abuse). In the case at hand, the jury found that Bennett had both abused his son and murdered his son in a heinous way. The evidence submitted by the State showed that Brandon Bennett was violently shaken; that Brandon's head was struck causing blunt force trauma; and that Bennett allowed Brandon to suffer for a number of hours before taking him to the hospital. Such acts constituted both felonious child abuse and heinous, atrocious, or cruel acts. Therefore, it was not error for the trial judge to allow the jury to receive both the felony child abuse and the HAC instruction.

¶91. Additionally, relying primarily on *Ring* and *Apprendi*, Bennett states that using the underlying felony of felonious child abuse as an aggravator upon which the jury relied in returning a sentence was improper. Bennett's claim is without merit. This Court has repeatedly held that evidence of the underlying crime can properly be used both to elevate the crime to capital murder and as an aggravating circumstance. *See Goodin v. State*, 787 So.2d 639, 654 (Miss. 2001); *Smith*, 729 at 1223; *Bell v. State*, 725 So.2d 836, 859 (Miss. 1998); *Crawford v. State*, 716 So.2d 1028, 1049-50 (Miss. 1998). Furthermore, the United States Supreme Court has held that there is no constitutional error in using the underlying felony as an aggravator. *Lowenfield v. Phelps*, 484 U.S. 231, 233, 108 S. Ct. 546, 98 L.Ed.2d 568 (1988). The Supreme Court stated in *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct.

43

2630, 129 L.Ed.2d 750 (1994), that "[t]he aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)."

¶92. Finally, Bennett's reliance on *Ring* and *Apprendi* is misplaced. As discussed *supra*, Bennett incorrectly bases such reliance and argument on the erroneous position that the maximum penalty for capital murder in Mississippi is life imprisonment. The maximum penalty for capital murder in Mississippi is death pursuant to Mississippi Code Annotated Section 1-3-4 and Section 99-19-101(1). The charge of capital murder, in Bennett's case, was based on the underlying felony of child abuse, and once Bennett was indicted for capital murder, he was immediately eligible upon conviction for the death penalty. Therefore, a sentence of death is not beyond the statutory maximum for Bennett's crimes, making *Apprendi* and *Ring* inapplicable as applied to Mississippi's capital sentencing scheme.

¶93. As a result, there was no error in the use of the underlying felony as an aggravator. Additionally, there was no error in submitting both the felonious child abuse aggravator and the HAC aggravator to the jury for consideration. Thus, Bennett's claim is without both procedural and substantive merit.

### XV. THE TRIAL COURT'S LIMITING INSTRUCTION OF THE ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL AGGRAVATING CIRCUMSTANCE

¶94. Bennett's final assignment of error alleges that the heinous, atrocious or cruel aggravator is unconstitutionally vague and should be revised or eliminated. Because Bennett failed to raise this issue at trial, he is procedurally barred from doing so on appeal. *See*

44

*Moawad*, 531 So.2d at 634 (trial judge cannot be put in error on matter not presented to him for decision). *See also Howard*, 507 So.2d at 63. Therefore, this assignment of error is procedurally barred from review by this Court.

¶95. Procedural bar notwithstanding, this issue is also without substantive merit. The trial court granted Sentencing Instruction AS-5:

> The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

> An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders - the conscienceless or pitiless crime which is unnecessarily torturous to the victim. IF you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim, then you may find this aggravating circumstance.

The heinous, atrocious or cruel circumstance instruction "is permissible where additional limiting language sufficiently refines and narrows the aggravating circumstance of 'heinous, atrocious or cruel' and thereby channels the jury's sentencing discretion in a principled way." *McGilberry v. State*, 843 So.2d 21, 28 (Miss. 2003) (quoting *Brown*, 798 at 501). This Court has consistently upheld the exact narrowing instruction on the heinous, atrocious and cruel aggravator that was allowed in Bennett's case. This Court has stated that such instruction satisfies constitutional requirements. *See Knox*, 805 So.2d at 533; *Stevens*, 806 So.2d at

45

1060; *Edwards v. State*, 737 So.2d 275, 319-20 (Miss. 1999); *Crawford*, 716 So. 2d at 1047;

*Lester v. State*, 692 So.2d 755, 797-98 (Miss. 1997); *Jackson*, 684 So.2d at 1236-37; *Carr*

*v. State*, 655 So.2d 824, 851-52 (Miss. 1995).

¶96.  The use of this exact limiting instruction has been approved by this Court.  The trial

judge in Bennett's case followed the law in granting the HAC aggravating instruction.

Accordingly, Bennett's fifteenth assignment of error is without merit.

## XVI.  STATUTORILY REQUIRED ISSUES

¶97.  When a death penalty case comes before this Court on direct appeal, this Court must

review other statutory issues, even if Bennett has not specifically raised them.  These issues

are set forth as follows in Mississippi Code Annotated Section 99-19-105:

> (3) With regard to the sentence, the court shall determine:
>
> > (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
> >
> > (b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;
> >
> > (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and
> >
> > (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

Miss. Code Ann. § 99-19-105(3) (1972).  With regard to Section 99-19-105(3)(a), this

46

question has already been addressed in Issues VII and VIII. With regard to Section 99-19-105(3)(b), the required analysis has been included in Issues X, XII, and XIV. With regard to Section 99-19-105(3)(c), this has been addressed in Issue XI. Finally, with regard to Section 99-19-105(3)(d), we do not find the aggravating circumstances to be invalid, and thus this issue is inapplicable. We have thoroughly discussed the aggravating circumstances in this case in Issues XII, XIII, XIV, and XV.

## CONCLUSION

¶98.    For the above and foregoing reasons, Bennett's conviction of capital murder and sentence of death are affirmed.

¶99.    **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.**

**SMITH, C.J., WALLER P.J., EASLEY, CARLSON, GRAVES AND RANDOLPH, JJ., CONCUR. COBB, P.J., AND DIAZ, J., NOT PARTICIPATING.**

47

# APPENDIX

## <u>DEATH CASES AFFIRMED BY THIS COURT</u>

*Spicer v. State,* 921 So.2d 292 (Miss. 2006).

*Hodges v. State,* 912 So.2d 730 (Miss. 2005).

*Walker v. State,* 913 So. 2d 198 (Miss. 2005).

*Le v. State,* 913 So.2d 913 (Miss. 2005).

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State* 883 So.2d 20 (Miss. 2004)

*Branch v. State,* 882 So.2d 36 (Miss. 2004).

*Scott v. State,* 878 So.2d 933 (Miss. 2004).

*Lynch v. State,* 877 So.2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So.2d 140 (Miss. 2004).

*Byrom v. State,* 863 So.2d 836 (Miss. 2003).

*Howell v. State,* 860 So.2d 704 (Miss. 2003).

*Howard v. State,* 853 So.2d 781 (Miss. 2003).

*Walker v. State,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State,* 800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).    *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).
***Jones v. State***, 517 So. 2d 1295 (Miss. 1987)*, **Jones v. Mississippi***, 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

# DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE

*Flowers v. State,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

### DEATH CASES REVERSED AS TO GUILT PHASE
### AND SENTENCE PHASE
### (continued)

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

**DEATH CASES REVERSED
AS TO PUNISHMENT AND REMANDED
FOR RESENTENCING TO LIFE IMPRISONMENT**


*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

**DEATH CASES REVERSED AS TO
PUNISHMENT AND REMANDED FOR A NEW TRIAL
ON SENTENCING PHASE ONLY**

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State***,** 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

**DEATH CASES REVERSED AS TO**
**PUNISHMENT AND REMANDED FOR A NEW TRIAL**
**ON SENTENCING PHASE ONLY**
**(continued)**

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).  *  Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.